**THIS OPINION IS A PRECEDENT OF THE TTAB**

Hearing:                                    Mailed:
May 31, 2011                                January 30, 2012

**UNITED STATES PATENT AND TRADEMARK OFFICE**
_____

**Trademark Trial and Appeal Board**
_____

Swiss Watch International, Inc.

v.

Federation of the Swiss Watch Industry
_____

Cancellation No. 92046786
_____

Amaury Cruz and Henry Rodriguez of Amaury Cruz & Associates
for Swiss Watch International

Abigail Rubinstein of Steptoe & Johnson LLP for Federation
of the Swiss Watch Industry
_____

Before Seeherman, Lykos and Kuczma[1], Administrative
Trademark Judges.

Opinion by Seeherman, Administrative Trademark Judge:

      Swiss Watch International, Inc. (petitioner) has

petitioned to cancel registrations for two certification

---

[1]  Judge Walters sat on the panel at the oral argument.  She has
since retired, and Judge Kuczma has been substituted for her on
this decision.  The change in composition of the panel does not
necessitate a rehearing of the oral argument.  Hunt Control
Systems Inc. v. Koninklijke Philips Electronics N.V., 98 USPQ2d
1558, 1560 (TTAB 2011); see also In re Bose, 772 F.2d 866, 227
USPQ 1, 4 (Fed. Cir. 1985).

marks owned by the Federation of the Swiss Watch Industry (respondent): Registration No. 3047277 for the mark SWISS and Registration No. 3038819 for the mark SWISS MADE, both in standard character form and both for certifying geographic origin of goods identified as "horological and chronometric instruments, namely, watches, clocks and their component parts and fittings thereof."[2] The certification statement in each registration is: "The certification mark, as used by persons authorized by the certifier, certifies geographical origin of the goods in Switzerland."

As for its standing and grounds for cancellation petitioner has asserted, in its amended petition for cancellation, that it owns a registration for the mark SWISS WATCH INTERNATIONAL; that it has applied to register the mark SWISS LEGEND for, inter alia, watches, and that this application has been refused registration by the USPTO on the basis of, among other things, likelihood of confusion with respondent's marks; that respondent intentionally misstated matters in the applications that resulted in its registrations or failed to state that it is not a government, a department of a government, or a body operating with governmental authorization; that the registrations were obtained fraudulently; that respondent

---

[2] Registration No. 3047277 issued on January 24, 2006, and Registration No. 3038819 issued on January 10, 2006.

has no legitimate control of the use of the terms SWISS or SWISS MADE; that respondent has improperly permitted and encouraged use of its marks for purposes other than to certify; that respondent discriminates in the granting of use of its certification marks; and that the terms SWISS and SWISS MADE cannot function as certification marks because they have become generic for horological and chronometric instruments.[3]

Respondent has admitted that it is an unincorporated association with offices in Switzerland, and otherwise has denied the salient allegations in the petition to cancel.[4]

The record and objections

By operation of the rules, the record includes the pleadings and the files of the registrations sought to be cancelled. Petitioner listed at page 5 of its trial brief the evidence that is of record:

> Respondent's responses to petitioner's
> interrogatories (Exhibits 88-96);
>
> Respondent's responses to petitioner's requests
> for admission (Exhibit 87);

---

[3] Petitioner also alleged that respondent has no authority to control the use of the terms SWISS or SWISS MADE, but did not, in its brief on the merits, present arguments regarding this aspect of its claim that respondent has failed to control the use of its marks.

[4] Respondent also asserted certain affirmative defenses, but because it made no mention of them in its trial brief, we deem them to have been waived. See, e.g., Knight Textile Corp. v. Jones Investment Co., 75 USPQ2d 1313, 1314 n.4 (TTAB 2005). In any event, with respect to those defenses, and as discussed herein, petitioner has shown its standing and that its petition to cancel states a claim.

3

Testimony depositions taken by petitioner of Lior Ben-Shmuel, Rick Ruz and Henry Rodriguez, with petitioner's exhibits 1-75 and respondent's exhibits 1-4,[5] and testimony depositions taken by petitioner on written questions of respondent's employees Jean-Daniel Pasche, Yves Bugmann and Vincent Stauffer, with petitioner's exhibits 130-137;[6]

Excerpts from printed publications, submitted by petitioner (Exhibits 76-78);

USPTO documents, submitted by petitioner (Exhibits 97-129);

Discovery documents (Exhibits 79-86), submitted by stipulation of the parties;

Testimony deposition upon written questions taken by respondent of Vincent Stauffer, with respondent's exhibits 1-8 and petitioner's exhibit 1-3;[7]

USPTO documents submitted by respondent (Exhibits A-I);

Dictionary definitions submitted by respondent (Exhibits J-O); and

---

[5] Petitioner submitted CD-ROM versions of these testimony depositions, as well as the printed versions. It was not necessary to submit the CD-ROMs and, in fact, the rules no longer provide that testimony can be submitted in this manner. See TBMP § 106.03 (3d ed. 2011).

[6] We find it necessary to comment on the listing of exhibits submitted as part of the testimony deposition of Henry Rodriguez. Approximately 60 exhibits are listed in the index as "The Printout." Trademark Rule 2.123(g)(3) provides, inter alia, that each deposition must contain "an index of the exhibits, briefly describing their nature and giving the pages at which they are introduced and offered in evidence." Although each of the exhibits are indeed "printouts," the listing of 60 exhibits in this manner is of almost no help to the Board, as it does not allow the judges reviewing the record to easily find the testimony regarding a particular exhibit.

[7] Although the procedure for taking testimony by written questions is a more cumbersome process than taking depositions upon oral examination, see Trademark Rule 2.124, the testimony of Messrs. Pasche, Bugmann and Stauffer was taken by this procedure because these witnesses were located outside of the United States.

Printed publications submitted by respondent (Exhibits P-S).[8]

In its trial brief respondent agreed that "the record consists of the items set forth in Petitioner's Trial Brief." p. 2. We agree that the foregoing evidence is of record.[9] In addition, respondent stated that the record also includes the file history for petitioner's application for the mark SWISS LEGEND, noting that petitioner asserted in the petition to cancel that its application to register this mark was refused by the USPTO, and that petitioner had mentioned in its brief that it had petitioned to cancel respondent's registrations after its application for SWISS LEGEND had been refused. Respondent included with its trial brief a declaration by respondent's attorney to which she attached a copy of an Office action in the SWISS LEGEND application, and copies of certain additional USPTO records. With its reply brief petitioner objected to these exhibits, contending that they were not properly made of record. This presents a somewhat unusual situation. Petitioner is correct that attaching a declaration with exhibits to a trial brief is not an acceptable method for making the

---

[8] Some of the articles are in foreign languages; because respondent did not submit translations, they have no probative value. Hard Rock Cafe Licensing Corp. v. Elsea, 48 USPQ2d 1400, 1405 (TTAB 1998)

[9] To the extent that any evidence submitted under a notice of reliance could not properly be made of record by this procedure, we treat the parties' statements as stipulating to the admission of such evidence.

evidence of record. At the same time, we have petitioner making statements in its brief about its own application that are not supported by any evidence properly of record, and respondent in its brief treating those statements as though they are true. Normally, we would view such actions as a stipulation by the parties that petitioner's application had been refused on the basis of respondent's registrations.[10] However, in this case it appears that respondent would not have made such a stipulation if it could not provide further information about the grounds for refusal of petitioner's application. In these circumstances, we both refuse to consider the improperly submitted evidence and decline to treat the information about petitioner's application as stipulated into the record. We add that, in any case, this does not have an effect on our decision, since petitioner's filing of an application, and the Office's refusal of it, would go to petitioner's standing, and petitioner has otherwise shown its standing through the evidence of its witness Lior Ben-Shmuel.

Petitioner also objected to certain statements made in respondent's brief, contending that they are based on

---

[10] In point of fact, the September 2, 2004 Office action for petitioner's application that was submitted with respondent's brief advised petitioner of respondent's then-prior pending applications and stated that, if they registered, they might serve as a basis for refusal of petitioner's application.

publications and webpages that were never made of record. With the exception of the dictionary definitions, of which we may take judicial notice, these objections are well taken, and no consideration has been given to evidence that was not properly made of record or to statements based on such evidence.

Respondent has raised objections as well, asserting that the deposition testimony of Rick Ruz and Henry Rodriguez consists "of nothing but unreliable hearsay testimony and should be stricken from the record." Brief, p. 2, n.1. Much of this testimony consists of statements made by the witnesses regarding information they received from third parties during telephone conversations with those third parties. We agree that this testimony constitutes inadmissible hearsay, as opposed to verbal acts, as petitioner is seeking to use what the third parties said to the witnesses to prove the truth of those statements. The cases that petitioner has cited in arguing that this testimony is not hearsay are inapposite.

Respondent has also objected to the Internet printouts submitted as exhibits to Messrs. Ruz's and Rodriguez's testimony (petitioner's exhibits 3-14 and 18-75), as hearsay. We overrule this objection. Although they do not prove the truth of the statements made therein, the printouts are acceptable to show that the statements were

made or the information was reported in the webpages.  In fact, printouts from Internet webpages may now be made of record by notice of reliance, without requiring the testimony of the witness printing out the webpages to introduce and authenticate them.  See Safer Inc. v. OMS Investments Inc., 94 USPQ2d 1031 (TTAB 2010).  The benefit to both the parties and the Board of making such evidence of record by notice of reliance is highlighted by the testimony depositions of these witnesses, which consist of page after page in which they identify the exhibits as being webpages that they printed.

Respondent also argues that the testimony of petitioner's witnesses Ruz and Rodriguez and the accompanying exhibits lack probative value.  We have already ruled that the testimony reporting what third parties told the witnesses in telephone conversations is hearsay and will not be considered.  As for the Internet evidence, respondent states that it could not readily verify the veracity of the evidence because Internet postings are transitory.  However, the website evidence contains the URLs from which the pages were taken, and therefore respondent could have ascertained whether the webpages were accurate or have been changed.  If respondent had shown that the website evidence was no longer accurate, it could have submitted it as a rebuttal to petitioner's evidence.  See Safer, 94 USPQ2d at 1039 ("The

date and source information on the face of Internet

documents allow the nonoffering party the opportunity to

verify the documents"). Respondent did not submit evidence

showing the webpages introduced by petitioner had changed or

were no longer accurate, and therefore we give the website

evidence the probative value to which it is entitled.

Respondent would also have us strike the testimony and

accompanying exhibits of Messrs. Ruz and Rodriguez regarding

use by third parties of the terms "Swiss" or "Swiss Made" in

connection with their watches because the witnesses did not

know whether or not the purveyors had been granted a license

by respondent, or if respondent was involved in a dispute

with the third parties. Although we decline to strike this

evidence, to the extent that there is no evidence as to

whether the watches satisfy respondent's certification

standards, we have considered this in determining the

probative weight to be accorded the testimony and exhibits.

The proceeding has been fully briefed, and an oral

hearing was held before the Board.[11]

As a preliminary matter, we note that respondent has

filed what it has captioned a "Motion to Request

Clarification After Oral Argument," a motion that petitioner

---

[11] It is noted that neither party included parallel cites to The United States Patents Quarterly (USPQ) in their citation of authorities. When cases are cited in a brief, the case citation should include a citation to the USPQ if the case has appeared in that reporter. TBMP §§ 101.03 and 801.03 (3d ed. 2011).

has opposed.  We agree with petitioner that respondent's motion is not seeking clarification of any statement made by the Board during oral argument, but is attempting to submit further comments in answer to questions raised by the judges during oral argument.  Accordingly, we have given no consideration to this motion, nor to the statements made by petitioner in its responsive submissions as to what it could have argued if petitioner were to make additional comments. We also point out that Board practice does not allow parties to submit additional comments or clarify their positions after oral hearing, unless specifically requested to do so by the Board.  For example, in the present case at the oral hearing the Board, noting that petitioner had submitted all of its evidence under seal, ordered that petitioner resubmit copies of its evidence in which only truly confidential material was redacted.  If petitioner had some question about how to comply with the Board's request, perhaps in view of the confidentiality agreements the parties had signed, a motion for clarification might have been warranted on this subject.

The Parties

The record shows that petitioner is a U.S. company that is a distributor or reseller of various brands of watches. Ben-Shmuel test., p. 6, 40.  Petitioner also manufactures

10

and sells watches under its own marks, including SWISS WATCH INTERNATIONAL and SWISS LEGEND.  Id., p. 32.

Respondent is a Swiss organization whose purpose is to contribute to the "defense and development of the Swiss watch industry."  Stauffer test., response 7.[12]  It has a membership of approximately 500 companies or associations linked to the Swiss watch industry; such entities must, with rare exceptions, have their headquarters in Switzerland. Id., 10.1.  Respondent visits the premises of applicants for membership in respondent to make sure the watches are produced in compliance with the "Ordinance governing the use of the appellation 'Switzerland' or 'Swiss' for watches." (English translation, hereafter referred to as "the Ordinance.")  Id., 10.2.  The Ordinance was issued by the Swiss Federal Government.  Id., 11.1.2.  The Ordinance "provides the conditions under which one may use Swiss names in relation with watches and other horological products."

---

[12]  Mr. Stauffer's testimony was taken on written questions, and therefore each question and answer was numbered.
    We also note that Mr. Stauffer's testimony deposition was marked "confidential" in its entirety, and respondent did not file a redacted copy for the public record.  In order to adequately explain our analysis and the facts on which it is based we must refer to some of the testimony and exhibits, although we have tried to be sensitive about revealing anything that may be truly confidential.  Further, because proceedings before the Board are public, all papers should be available to the public, except for information that is truly confidential. It is clear that not everything in Mr. Stauffer's testimony fits that description.  **Accordingly, respondent is allowed until thirty (30) days after the issue date of this decision to file a redacted version of Mr. Stauffer's testimony, failing which the testimony in its entirety will become part of the public record.**

Id., 12.2.  The Swiss Federal Government, in article 53 of the Ordinance, has entrusted respondent with the task "of attributing identification signs to all producers of Swiss watches and movements and to keep the register thereof." Id., 12.4.1.  The bylaws of the Swiss Federal Institute of Intellectual Property (Switzerland's equivalent of the USPTO) entrust respondent with the task of combating infringements of intellectual property rights, including Swiss geographical indications.  Id.

<u>Standing</u>

Mr. Ben-Shmuel has testified that his company sells, distributes and arranges for the manufacture of watches, including under the trademarks SWISS WATCH INTERNATIONAL and SWISS LEGEND.  Therefore, petitioner has shown that it is not an intermeddler, but has a real interest in this proceeding.  Accordingly, it has established its standing. Cunningham v. Laser Golf Corp., 222 F.3d 943, 55 USPQ2d 1842 (Fed. Cir. 2000); Lipton Industries, Inc. v. Ralston Purina Co., 670 F.2d 1024, 213 USPQ 185 (CCPA 1982).

<u>Certification marks</u>

Because this proceeding involves certification marks, it is useful to review the provisions of the Trademark Act regarding such marks.  "Certification mark" is defined in Section 45 of the Act, 15 U.S.C. § 1127:

The term "certification mark" means any word, name, symbol, or device, or any combination thereof—

(1) used by a person other than its owner, or

(2) which its owner has a bona fide intention to permit a person other than the owner to use in commerce and files an application to register on the principal register established by this chapter,

to certify regional or other origin, material, mode of manufacture, quality, accuracy, or other characteristics of such person's goods or services or that the work or labor on the goods or services was performed by members of a union or other organization.

Section 4 of the Trademark Act, 15 U.S.C. § 1054, provides:

Subject to the provisions relating to the registration of trademarks, so far as they are applicable, collective and certification marks, including indications of regional origin, shall be registrable under this chapter, in the same manner and with the same effect as are trademarks, by persons, and nations, States, municipalities, and the like, exercising legitimate control over the use of the marks sought to be registered, even though not possessing an industrial or commercial establishment, and when registered they shall be entitled to the protection provided in this chapter in the case of trademarks, except in the case of certification marks when used so as to represent falsely that the owner or a user thereof makes or sells the goods or performs the services on or in connection with which such mark is used. Applications and procedure under this section shall conform as nearly as practicable to those prescribed for the registration of trademarks.

Section 14(5), 15 U.S.C. § 1064(5) provides that a petition

to cancel a registration of a mark may be brought:

At any time in the case of a certification mark on the ground that the registrant (A) does not control, or is not able legitimately to exercise control over, the use of such mark, or (B) engages

13

in the production or marketing of any goods or services to which the certification mark is applied, or (C) permits the use of the certification mark for purposes other than to certify, or (D) discriminately refuses to certify or to continue to certify the goods or services of any person who maintains the standards or conditions which such mark certifies.

In addition, as with all registrations, a petition to cancel a certification mark registration may be brought under Section 14(3) at any time "if the registered mark becomes the generic name for the goods or services, or a portion thereof, for which it is registered," or if the registration was obtained fraudulently.

Petitioner has petitioned to cancel respondent's certification marks on grounds A, C and D enumerated in Section 14(5), as well as the grounds of genericness and fraud set forth in Section 14(3). The standard of proof for cancelling certification mark registrations is the same as for cancelling a trademark registration, namely, petitioner bears the burden of proving its case by a preponderance of the evidence. Midwest Plastic Fabricators Inc. v. Underwriters Laboratories Inc., 906 F.2d 1568, 15 USPQ2d 1359, 1361 (Fed. Cir. 1990).

Claim 1: Respondent permits its marks to be used for purposes other than to certify

The first ground discussed by petitioner in its brief is that respondent has permitted use of its certification marks for purposes other than to certify (Section 14(5)(C)).

Petitioner bases this claim on the fact that respondent allows its members and licensees to use trademarks that include the word SWISS.  Petitioner points to numerous uses of such marks, including *Léonard* swiss, WENGER SWISS MILITARY, SWISS ARMY, and DAVOSA SWISS.

The problem with petitioner's position is that it treats these third parties' uses of their various marks as though they are using the mark SWISS *per se*, i.e., petitioner views the various SWISS formative marks used by the third parties as though they constitute a trademark use of respondent's certification mark SWISS.  However, respondent's certification mark is not LEONARD SWISS or WENGER SWISS MILITARY or any of the marks used by respondent's members or licensees.[13]  Although a certification mark cannot also be used as a trademark, for that prohibition to apply, the mark must be "identical or substantially or virtually identical."  In re 88Open Consortium Ltd., 28 USPQ2d 1314 (TTAB 1993) (88OPEN COMPATIBILITY CERTIFIED and design could be registered as a certification mark despite the applicant's ownership of a trademark registration for 88OPEN).  It is clear that all of the third-party marks that are of record contain additional wording and/or design elements such that they cannot be

---

[13]  Petitioner has not pointed to any trademark use by third parties of SWISS MADE, and the record does not reflect any.

15

considered identical or substantially or virtually identical to respondent's marks. We are not persuaded by petitioner's argument that respondent's members' and licensees' "trademarks are not sufficiently separate and distinct from Registrant's certification marks to satisfy this Board's requirement that the difference in purpose between the marks 'would be recognized by the purchasers of the certified goods'" [quoting In re Monsanto, 201 USPQ 864, 869 (TTAB 1978)], and that "[t]he salient and distinguishing feature of these trademarks is the term 'Swiss.'" Reply brief, p. 10. On the contrary, the additional elements in the various marks clearly make these marks different from SWISS and from SWISS MADE.

We acknowledge that, in general, entities that use a registrant's certification mark do not include the mark as part of their own trademarks, and that there are pitfalls to allowing users of the certification mark to do so.[14] However, trademark law does not prohibit a certification mark owner from permitting such use. Petitioner has quoted language from Section 19.92.50 of 3 J. Thomas McCarthy,

---

[14] For example, if the certifying authority determines that a user of the term is not complying with the certification standards, the certifying authority may have to undertake a cancellation proceeding or court action in order to have that party's registration cancelled. Further, the inclusion by many different entities of a certification mark in their individual trademarks may make it more difficult for the owner of the certification mark to prove likelihood of confusion by a third party that attempts to use that same term in its own mark.

McCarthy on Trademarks and Unfair Competition, 19-277 (4th
ed. 2002), to support its claim that a certification mark
owner is required to protect its mark:  "[E]ven where a
defendant's product contains ingredients which have been
certified by the owner of a certification mark, the
defendant's incorporation of that certification mark into
its own composite trademark might be likely to cause
confusion as to sponsorship, affiliation or connection."
The context of the quoted language relates to whether the
Board could find *likelihood of confusion* where a
certification mark owner brought an action against the user
of a mark that, without permission, incorporated the
certification mark into its own mark.[15]  It does not stand
for the proposition that a certification mark owner may not
permit an authorized user to include the certification mark
within the user's own trademark.[16]

Petitioner also argues, in support of this claim, that
respondent has allowed the use by non-authorized third
parties of marks that incorporate the term SWISS, and also
has allowed the use of SWISS and SWISS MADE in a non-

---

[15]  The case cited in McCarthy in support of this statement was
Institut National Des Appellations d'Origine v. Brown-Forman
Corp., 47 USPQ2d 1875 (TTAB 1998), which McCarthy describes as
"denying summary judgment of dismissal since it is possible that
a likelihood of confusion with opposer's COGNAC certification
mark could result from applicant's CANADIAN MIST AND COGNAC
trademark for a blend of Canadian whiskey and genine COGNAC
brandy."

trademark fashion to promote the sale of watches.  Aside from the fact that none of the third-party uses is for marks that are "identical or substantially or virtually identical" to SWISS or SWISS MADE, the prohibition as to using the same mark as a certification mark and trademark applies to uses that are made or authorized by the certification mark owner. Thus, this argument that respondent has "allowed" non-authorized uses is more appropriately considered in conjunction with the claim that respondent does not control use of its certification marks, and in fact petitioner has referred throughout Section B of its brief ("Registrant does not control use of its certification marks") to the facts and arguments it has made here.  Therefore, we address it below.

Claim 2:  Respondent does not control use of its marks

Section 14(5)(A) of the Trademark Act provides that the registration of a certification mark may be cancelled if the registrant does not control, or is not able legitimately to exercise control over, the use of such mark.  "The purpose of requiring control over use of a certification mark, as with a trademark, is two-fold:  to protect the value of the mark and its significance as an indication of source, and to prevent the public from being misled or deceived as to the source of the product or its genuineness."  Tea Board of

---

[16]  The other cases cited by petitioner involving likelihood of

India v. Republic of Tea Inc., 80 USPQ2d 1881, 1886 (TTAB 2006), citing Midwest Plastic Fabricators, Inc. v. Underwriters Labs., Inc., 906 F.2d 1568, 15 USPQ2d 1359, 1362 (Fed. Cir. 1990). The statute does not define "control." Case law has interpreted this provision in two ways. One is that the owner of the mark has, implicitly or explicitly, given permission to others to use the mark without ensuring that their products or services meet the certification mark owner's standards. For example, in Midwest Plastic Fabricators, it was claimed that the certification mark owner, Underwriters Laboratories, did not adequately inspect the products on which it allowed companies to apply the UL certification mark. The second interpretation of this provision is akin to the mark becoming generic, i.e., that the certification mark owner has failed to control use by third parties to the extent that the mark no longer acts as an indicator of source, or more particularly, as an indicator of certification of the products or services. See Tea Board of India, 80 USPQ2d at 1886.

Petitioner bases its claim that respondent does not control use of its certification marks on the contention that there is "widespread unauthorized use of the term SWISS by third parties who are not members or licensees of

---

confusion grounds are similarly inapposite.

Registrant's organization." Brief, p. 23. Petitioner has listed, at pages 18-21 of its brief, approximately 22 trademarks that include the term SWISS.[17] Thus, petitioner's claim is more akin to the second interpretation discussed above, since petitioner does not claim that respondent has failed to ensure that its members and licensees follow its standards.[18] To the extent that petitioner is claiming that the unauthorized uses are so extensive that SWISS and SWISS MADE have ceased to function as certification marks because the words are generic, we will address that subsequently. We confine our comments here to whether respondent has made adequate efforts to control the unauthorized use of its marks.

Respondent's witness, Vincent Stauffer, has testified as to respondent's actions with respect to the unauthorized uses asserted by petitioner, and to respondent's policing

---

[17] As part of the record adduced by petitioner, it submitted approximately 75 exhibits consisting of Internet printouts showing the term SWISS used for various watches offered for sale, without making a distinction as to whether the users of the trademarks were members or licensees of respondent, whose use complied with respondent's certification requirements. Respondent had provided such lists to petitioner through discovery, and both petitioner and respondent have made them of record, petitioner through a notice of reliance and respondent as an exhibit to Mr. Stauffer's testimony. We assume that petitioner has listed in its brief all the trademarks it believes are being used without respondent's permission or control.

[18] There is some question about whether one or two of respondent's members may, with particular brands, not have followed all of the requirements of the Ordinance. In any event, not only has this not been clearly proven, but any such misuse is so limited that it would not be a basis for cancelling the

efforts in general. We are somewhat hampered in our discussion of these activities because, as we stated previously, Mr. Stauffer's testimony has been submitted under seal.[19] We have tried to respect the information in the testimony that is truly confidential, and will refer to it generally.

Respondent has shown, through the testimony of Mr. Stauffer, that it engages in significant activities to ensure that only companies adhering to its standards (and by extension, the standards of the Swiss Ordinance) use the terms SWISS or SWISS MADE in connection with watches. It monitors all trademark applications in Class 14 worldwide and files opposition proceedings when there are dubious cases, monitors the use of SWISS, SWITZERLAND and SWISS MOVEMENT on watches displayed in watch-specialized magazines, buys or requests watch samples and inspects them,

registration. As stated *infra*, control does not have to be absolute.

[19] At the oral hearing, after noting that the entire testimony deposition of petitioner's witness Lior Ben-Shmuel had been marked "confidential," the Board ordered petitioner to submit a redacted version for the public record. We failed to give a similar instruction to respondent regarding Mr. Stauffer's testimony because we were not aware at the time that a redacted version had not been submitted, since the Board generally reviews only the briefs, and not the entire record, prior to oral argument. It was clear from the parties' briefs and the statements made during oral argument that Mr. Ben-Shmuel's entire testimony had been submitted under seal, but the briefs did not similarly reveal that the Stauffer testimony had been marked "confidential" in its entirety. As noted in footnote 12, respondent must now provide a redacted version of Mr. Stauffer's testimony.

and inspects watches which have been seized by police forces or customs authorities worldwide. (response 15.1.1). In the United States, respondent has filed 25 oppositions against marks incorporating the terms SWISS or SWITZERLAND (response 16.1.3), with six settled via an agreement by which the applicant agreed to comply with the standards of the Swiss Ordinance (16.1.5, 16.1.6), and ten resolved with the withdrawal or abandonment of the application (16.1.7). Respondent also has worked with customs in the United States to prevent the importation of watches bearing the term "SWISS" which did not meet the standards of the Swiss Ordinance. (response 15.1.4).

Of the 22 uncontrolled trademark uses asserted by petitioner, Mr. Stauffer has testified that respondent has brought oppositions against six of them, and is involved in actions against two others.[20] Others of the remaining asserted uncontrolled trademark uses do not involve registered marks, while two other applications have been abandoned, and respondent has contacted other companies to determine what actions will be taken.

Although petitioner acknowledges that respondent is not required to exercise absolute control, and that respondent has taken some actions, petitioner asserts that "it is

---

[20] It is unclear from the wording of the questions in Mr. Stauffer's testimony whether these actions are oppositions.

reasonable to expect greater control than demonstrated by Registrant and its predecessor in interest when they have had over 75 years, since the alleged date of first use in 1931, to monitor and limit the unauthorized uses of 'Swiss' and 'Swiss Made' products in the U.S."  Brief, p. 23. The statute does not define "control" or indicate the degree of control required.  As petitioner acknowledges, absolute control is not only not required, but the Board has recognized that absolute control would be impossible.  Tea Board of India v. Republic of Tea Inc., 80 USPQ2d at 1888; see also Midwest Plastic Fabricators, 15 USPQ2d at 1362 (the certification mark owner's affirmative duty to control its certification mark does not mean "absolute control" since this would be "impracticable, if not impossible to satisfy"); Engineered Mechanical Services, Inc. v. Applied Mechanical Technology, Inc., 584 F. Supp. 1149, 223 USPQ 324 (M.D. La. 1984) ("The owner of a mark is not required to constantly monitor every nook and cranny of the entire nation and to fire both barrels of his shotgun instantly upon spotting a possible infringer ….").

The question is whether the control is adequate.  As stated in Midwest Plastic Fabricators, 15 USPQ2d at 1363, "the owner must take reasonable steps, under all the circumstances of the case, to prevent the public from being

misled." Respondent has an extensive worldwide monitoring and enforcement system in place, including working with U.S. Customs officials. It has, as noted, brought numerous oppositions in the United States, and negotiated the abandonment or withdrawal of numerous applications. It has also filed letters of protest with the USPTO. We find, in the circumstances of this case, that respondent's control is adequate.

We also note petitioner's contention that respondent cannot control use of its certification marks "because of widespread third party use prior to Registrant's date of registration of its Marks, of the designation SWISS in connection with watches that do not originate in Switzerland." Brief, p. 24. It appears that petitioner is arguing that respondent can take no action against such registrations, and therefore, in effect, such third-party uses are permanent. However, petitioner's position is not correct. The date of the registration of respondent's marks is not the operative date for respondent to bring an action, since its rights do not arise only with the issuance of its registrations.

Petitioner has also submitted website evidence in which such terms as "Swiss," "Swiss made," "Swiss quartz," "Swiss movement," and "Swiss collection" have been used in the descriptions of watches that are offered for sale on the

24

various webpages.  Our review of these exhibits shows that in most cases SWISS is used to identify the movements used in the advertised watches.  Mr. Stauffer has also testified, with respect to some of these uses, that he is unfamiliar with them, or could only say that the trademarks used in connection with the watches have not been registered in the United States.[21]

We do not regard accurate statements describing that a watch has a Swiss movement as showing that respondent has allowed uncontrolled use of its marks.  Nor are instances of misuse that had not come to respondent's attention, when the record shows that respondent has made very clear efforts to monitor third-party uses of SWISS and SWISS MADE.  Although we acknowledge that there appear to be instances of misuse of SWISS, the instances that are in the record are not so extensive for us to conclude that the registrations should be cancelled.  "[T]he mere fact of misuse … is not sufficient to raise an inference that the control was not adequate or that [SWISS or SWISS MADE] has lost all significance as a mark.  Even if control is not maintained and misuse occurs, it must be shown that the misuse was of

---

[21]  Because of the nature of testimony on written questions, it is not possible to pose a follow-up question upon learning of an answer; instead, one must anticipate what the answer will be and submit a follow-up question in advance.  As a result, the responses are not as complete as can be obtained through a deposition upon oral examination.

such significance to permit an inference that the mark is generic." Tea Board of India, 80 USPQ2d at 1888.

Claim 3: Respondent discriminates

Section 14(5)(D) provides for the cancellation of a certification mark if the registrant "discriminately refuses to certify or to continue to certify the goods or services of any person who maintains the standards or conditions which such mark certifies." The basis for petitioner's claim of discrimination is not that respondent refuses to certify the goods of those who maintain the standards which its marks certify, but that respondent's standards are wrong. Petitioner argues that respondent's requirements that the watch movement be cased up in Switzerland and that the final inspection of the watch take place in Switzerland are unnecessary. This position is not well taken. The statutory provision is not dependent upon whether the Board or a third party likes the standards, or sees the need for them; the statute requires only that the owner of the certification mark allow any entity that meets the standards, whatever the owner determines those standards to be, to use the mark.

Petitioner also argues that respondent discriminates in the approval for use of its certification marks because it may deny membership in its organization. We are not

26

persuaded by this argument.  Although members of its organization are permitted to use the certification marks (because to be a member an entity must comply with the standards set forth in the Ordinance), there is no requirement that an entity be a member of respondent in order to use the certification marks.  Indeed, respondent has provided a list of companies that are not members but that are licensed to use its certification marks.

Petitioner has also argued that respondent's standards discriminate against U.S. companies that adhere to U.S. customs regulations.  In its main brief petitioner has pointed to the Tariff Act of 1930, which provides that the country of origin of the movement determines the country of origin of the watch, and asserts that therefore U.S. Customs "would recognize 'Swiss Made' as an appropriate marking on the watch."  pp. 25-26.  Whether or not U.S. Customs would consider a watch to be made in Switzerland for duty purposes, or would consider "Swiss Made" to be acceptable to indicate the country of origin, it does not follow that respondent is discriminating against U.S. companies in terms of the use of its certification marks.  Again, the language of the statute is clear:  the discrimination contemplated by the statute refers to a refusal by the certification mark owner to certify "the goods or services of any person who

maintains the standards or conditions which such mark

certifies."[22]

In short, petitioner has not submitted any evidence

that respondent has refused to permit the use of its

certification marks for watches meeting its standards,

namely, the watch movement is made in Switzerland, the watch

is "cased up" in Switzerland, and the final inspection of

the watch takes place in Switzerland.[23]

Claim 4:  Genericness

A registration for a certification mark, like other

trademarks, may be cancelled at any time if the mark becomes

the generic name for the goods or services.  Trademark Act

Section 14(3).  Petitioner claims that respondent's marks

are generic for watches, clocks and their component parts

---

[22]  In its reply brief, petitioner has asserted a public policy
argument based on U.S. customs regulations, stating that U.S.
companies cannot simultaneously comply both with U.S. customs
regulations and with respondent's certification mark standards.
To the extent that there is any conflict (and we do not say that
there is), this is not the forum to resolve it.  The grounds upon
which a petition to cancel a certification mark may be brought
have been set out elsewhere in this opinion.  "Against public
policy" or "conflicts with Customs requirements" are not
permissible grounds for a cancellation proceeding.  Cf. The
Institut National Des Appellations D'Origine v. Vinters
International Company, Inc., 958 F.2d 1574, 22 USPQ2d 1190, 1197
(Fed. Cir. 1992) ("We deal here only with the issue of
registrability and what may be registered in the PTO.  It is not
our concern or that of the PTO what [the applicant] must do to
comply with the BATF *labelling* requirements.")
[23]  Petitioner has stated that respondent denied petitioner "its
certification."  Petitioner's arguments in connection with this
statement have been marked "confidential," and therefore we
cannot discuss them.  Suffice it to say that there is no evidence
that petitioner requested respondent to allow it to use
respondent's certification marks for watches, or that

28

and fittings because the terms "primarily signify to the American purchaser the type of watch regardless of regional origin."  Brief, p. 27.[24]

Petitioner's first argument is based on the case In re Cooperative Produttori Latte E Fontina Valle D'Aosta, 230 USPQ 131 (TTAB 1986).  An Italian cooperative had applied to register as a certification mark for "FONTINA cheese" the following design,



and the examining attorney required a disclaimer of FONTINA on the ground that it merely described or is the generic name for a type of cheese.  The Board found that "fontina" is not a certification mark indicating regional origin, but that the lower-case treatment of this word in various references as naming a kind of cheese with certain characteristics, and the evidence showing there is a domestic fontina cheese

_____

petitioner's watches met respondent's certification mark standards.
[24]  In this section of petitioner's brief, it directs its comments to respondent's mark SWISS, even titling the section "The term SWISS has become a generic term for the goods in question." However, because there are occasional references to SWISS MADE as well, we do not consider petitioner to have waived the ground of genericness with respect to SWISS MADE.

demonstrates to us that, to the American purchaser, "fontina" primarily signifies a type of cheese (much like brie, swiss, parmesan or mozzarella) regardless of regional origin, rather than a mark of certification.

Id. at 134.

Petitioner argues that similar evidence of record in this proceeding "supports Petitioner's position that, for the goods at issue, "Swiss" and "Swiss made" primarily signify to the American purchaser the type of watch regardless of regional origin."  Brief, p. 27.  The evidence to which petitioner points is "common usages by the press of the terms "Swiss watch" and "Swiss precision" to convey certain qualities associated with accurate watches."  Id. at 28.  The excerpts submitted by petitioner, as part of its Exhibit 76, include the following:

> … who compares the craftsmanship of a car to a fine Swiss watch.  *Milwaukee Journal Sentinel*, Sept. 7, 2003;

> "It [an airplane] runs like a fine Swiss watch," he said, noting that the plane goes about 90 miles per hour.  *The Detroit News*, Sept. 5, 2003;

> Manhattan is like a fine Swiss watch, the old-fashioned kind that you wind up.  They are incredible pieces of precision workmanship ….  *Chillicothe Gazette*, August 20, 2003;

> Instead of ticking like a Swiss watch, Vanderbilt's offense looked more like Swiss cheese when it first made contact with the Commodores' defense.  *The Tennessean*, August 16, 2003.[25]

---

[25]  Besides these uses of "Swiss watch" as a simile or metaphor, petitioner also submitted excerpts of articles in which the phrase "Swiss watch" refers to actual Swiss watches, for example, "Swatch, the Swiss watch maker, made a name for themselves in the

We find this evidence unpersuasive in showing that the term "Swiss watch," when it is used for watches, has the meaning of any precise watch, regardless of geographic origin. On the contrary, the use of "Swiss watch" as a metaphor for something of precision workmanship shows the renown of Swiss watches. In no way is this evidence similar to the evidence adduced in the Fontina case, where the term "fontina" was shown to refer to a type of cheese.

Petitioner also contends that SWISS and SWISS MADE have become generic for a category of watches, irrespective of where the watch is made, because of the evidence of use of SWISS by third parties that are not respondent's members or licensees and use SWISS as a trademark on goods that do not originate in Switzerland. As we indicated in discussing petitioner's claim that respondent does not control use of its marks, petitioner submitted approximately 75 exhibits consisting of Internet printouts showing the term SWISS used in connection with various watches. The witnesses who authenticated the Internet printout exhibits did not know whether the watches shown therein originated in Switzerland. In addition, during his testimony, Mr. Ben-Shmuel was asked about various third-party SWISS-formative marks for watches. Mr. Ben-Shmuel testified that some of the watches he was

---

early '80s …"; and "For the couple with a taste for classic Swiss watches with beautiful Volunteer faces, there were two …."

31

asked about did not originate in Switzerland. However, because the documents he referred to in his testimony were not made of record, we cannot ascertain in what way SWISS or SWISS MADE was used.[26] Further, the basis for his knowledge was, in most cases, rather vague. For example:

> Q: Do their watches [Skagen] meet the Ordinance requirements?
>
> A: I don't know for certain but I don't think so. I don't know for certain.

Test. p. 73

> ***
>
> Q: Have you--do their watches, the Aqua Swiss watches meet the Ordinance requirement?
>
> A: Again, and this is a brand that I have never dealt with, but I am pretty familiar with them; I have seen them advertised, and I have seen them around. I was offered deals with them but I never purchased it. And, from my understanding, not the Swiss Federation, they probably do not abide by the Swiss Federation rules but they do use 100 percent Swiss made movements which would provide by that.
>
> Q: And how would they not meet the Swiss Ordinance?
>
> A: Just the fact that they don't want to assemble the final inspection in Switzerland.
>
> Q: And how do you know that?
>
> A: Just from hearsay when we were discussing on the deal or things like that. Now, they may do it on some of their watches. But the particular offer, you know, that I was offered at the time,

---

[26] There is no indication in the record that the documents reviewed by Mr. Ben-Shmuel in connection with his testimony were the exhibits introduced during the testimony of petitioner's other witnesses. The transcript includes only the statement by petitioner's attorney that "For the following series of questions I am just going to use a document to refresh his memory." p. 15.

is going back a few years, from my recollection, that wasn't the case.

Test. p. 75.

This is not to say that all uses of SWISS and SWISS MADE in connection with watches that are of record are authorized or meet respondent's certification requirements. Certainly the testimony of Vincent Stauffer, respondent's employee, shows that there are uses that do not conform to respondent's certification standards and that, while respondent has taken many actions to stop unauthorized uses, it has not prevented all of them. The question, though, is whether, as a result of these unauthorized uses, SWISS and SWISS MADE have lost their capacity to function as certification marks indicating geographic origin of the watches in Switzerland, and instead are viewed as generic "indicators of certain qualities or characteristics." Petitioner's Brief, p. 29.

First, we point out that a certification mark that is used to certify geographical origin can also certify certain qualities and characteristics of the product that are due to factors associated with the geographic area. Tea Board of India, 80 USPQ2d at 1887. In fact, the very definition of a certification mark is that it can certify quality, or accuracy, or other characteristics. Thus, the terms SWISS and SWISS MADE

33

for watches can certify the quality or characteristic that the watches are timepieces of great precision, without affecting their status as certification marks. On the contrary, the association of Switzerland with precision watches actually enhances the certification mark function of SWISS and SWISS MADE.

We find petitioner has not proved that SWISS and SWISS MADE have lost their significance as indicators of geographic source. The issue is not whether the public is expressly aware of the certification function of the marks or the certification process underlying use of the marks, but rather is whether the public understands that goods bearing the marks come only from the region named in the marks. Institut National Des Appellations d'Origine v. Brown-Forman Corp., 47 USPQ2d 1875, 1885 (TTAB 1998). The relatively small number of clearly unauthorized third-party uses of SWISS or SWISS MADE that are in the record are insufficient to show that these terms, when used in connection with watches, refer to any watch that works with precision, as opposed to indicating their geographic origin. As the Board stated in Tea Board of India, 80 USPQ2d at 1893, "even assuming applicant had produced evidence of misuse, that is, use indicating a different geographic source for the tea or use in connection with nongenuine tea, we will not infer that the mark has become generic unless it

is also shown by applicant that the misuse is so widespread and of such duration that it has caused DARJEELING to lose all significance as a mark."

Petitioner has also argued that "the terms 'Swiss' and 'Swiss made' have become generic for a category of horological instruments, namely watches that incorporate movements in the Swiss style or use Swiss-developed mechanics, irrespective of where the watch is made."  Brief, p. 29.  It appears to be petitioner's position that SWISS identifies a type of movement, or a watch using such a type of movement.  However, the evidence of record does not support such a finding.  Certainly we cannot ascertain from the exhibits advertising various watches as having a "Swiss movement" that the movements do not come from Switzerland, or that "Swiss movement" refers to a specific type of movement that was originally developed in Switzerland but is now made throughout the world.  As noted, the witnesses who introduced these exhibits during their testimony did not know whether or not the watches had Swiss movements, i.e., movements made in Switzerland.  Petitioner cites to the testimony of Mr. Ben-Shmuel, at pages 8-9, in support of its argument, but that testimony is far from clear, and certainly insufficient to meet petitioner's burden of showing that SWISS is a generic term for watch movements,

and therefore generic for watches containing a particular type of movement:

> Q:  Based on your knowledge of the industry, and your experience, what is the US consuming public's understanding of the term "Swiss?"
>
> A:  You know, again, I guess, you know, the most important aspect of a timepiece, you know, is the brains of the actual timepiece, which is, you know, a movement if it's a quartz or an automatic movement.  And, you know, when people look for-- when consumers, in my experience, when they're looking into a quality, that they care about those major components which is art--is the Movement.
>
> Q:  Based on your knowledge and industry experience, is the term "Swiss" used in connection with watches that are made outside of Switzerland?
>
> A:  Yes, definitely.  There are many companies out there that builds [sic] watches outside of Switzerland, but import watches into other countries, including the United States and abroad, obviously, that have "Swiss" in their name or somewhere on their watch, that the watches are not [sic] made or assembled in China, or somewhere else around the world.

(objections omitted).

Petitioner also asserts that "certification marks that act as an indicator of geographic origin generally arise due to the use of a geographic term in connection with products tied to the land," brief, p. 29, and appears to contend that because respondent's marks SWISS and SWISS made are used in connection with manufactured goods--watches--consumers will not view the terms as indicating goods that invariably come from Switzerland.  To the extent that petitioner is suggesting that geographic terms cannot function as

certification marks unless they are used to certify goods that come from the land, we are unaware of any case law that would support such a position. Even in those situations where a certification mark is used in connection with products having an agricultural origin, there is a recognition that processing of the product, even when that processing does not have an intrinsic connection with the land, can be an element of the certification standards. See, for example, Bureau National Interprofessionnel Du Cognac v. International Better Drinks Corp., 6 USPQ2d 1610 (TTAB 1988), in which the methods of distillation and aging conditions were, in addition to the grapes grown in the region, part of the standards for the use of the certification mark COGNAC. In this case, the manufacture of watches is so closely associated with Switzerland that even Mr. Ben-Shmuel testified that "just like the Swiss are known for chocolate, they are known for old watch making," and that "it's [Switzerland] a region which is known for where the watch industry kind of started," p. 7; "the Swiss are considered legends in the watch industry" and the "Swiss are associated with the watch industry," pp. 50-51.

In short, the evidence shows that the geographic connection between watches and Switzerland is very strong, and that when the terms SWISS and SWISS MADE are used in connection with watches, consumers will understand that they

signify the geographic origin of the goods, and will not regard the marks as generic terms.

Claim 5:  Fraud

Although in its petition for cancellation petitioner did not specify that the ground of fraud was limited to respondent's registration for SWISS MADE, it is clear from petitioner's briefs that this is the case.  See Subhead C: "Registrant committed fraud on the PTO in registering SWISS MADE."  Brief, p. 24.[27]  Petitioner asserts that in response to the Office action dated January 17, 2003, respondent submitted an exhibit containing its certification standards coupled with the abstract of the Swiss Ordinance on which its standards are based.  Petitioner contends that "registrant's decision to submit both documents was calculated to outfox the examiner" because the certification standards document respondent submitted "provides no description of the standards used by Registrant to determine

_____

[27]  Moreover, the basis for petitioner's fraud claim appears to have changed.  In the petition for cancellation petitioner alleged that respondent "intentionally misstated matters in its application or failed to state that it is not a government, one of the departments of a government, or a body operating with governmental authorization …."  Petitioner did not pursue any claim that respondent failed to inform the examining attorney that it is not a government department and, indeed, it appears that respondent does operate with governmental authorization. Although petitioner did not plead, with the specificity required, that its fraud claim was based on misstatements in connection with respondent's certification standards, the parties have proceeded at trial as if that were the claim, and we therefore treat the pleadings as amended to conform to the evidence.  See Fed. R. Civ. P. 15(b).

38

whether others may use the mark SWISS MADE"; that "[t]he standards speak only of the indicators 'Swiss,' 'Swiss case,' 'Swiss dial,' and 'Swiss parts.'" Id. It is petitioner's position that the submission of the Ordinance, "which does discuss use of 'Swiss made,' was made to confuse the examiner into believing Registrant's standards covered" the mark SWISS MADE in order to overcome the Office action and obtain a registration. Id.

Fraud in procuring a trademark registration or renewal occurs when an applicant knowingly makes false, material representations of fact in connection with its application with an intent to deceive. In re Bose Corp., 580 F.3d 1240, 91 USPQ2d 1938, 1941 (Fed. Cir. 2009); Torres v. Cantine Torresella S.r.l. 808 F.2d 46, 1 USPQ2d 1483, 1484 (Fed. Cir. 1986). A party seeking cancellation of a trademark registration for fraudulent procurement bears a heavy burden of proof. W.D. Byron & Sons, Inc. v. Stein Bros. Mfg. Co., 377 F.2d 1001, 153 USPQ 749, 750 (CCPA 1967). Indeed, "the very nature of the charge of fraud requires that it be proven 'to the hilt' with clear and convincing evidence. There is no room for speculation, inference or surmise and, obviously, any doubt must be resolved against the charging party." Smith Int'l, Inc. v. Olin Corp., 209 USPQ 1033, 1044 (TTAB 1981).

39

The file for the registration of SWISS MADE shows that, when the underlying application was being examined, the examining attorney, on January 17, 2003, issued an Office action requiring respondent to "submit a copy of the standards used to determine whether others may use the certification mark with their goods or services."  In response, respondent submitted "a copy of its standards as well as an abstract of the Swiss Ordinance on which these standards are based."  Petitioner is correct that the standards submitted by respondent do not specifically use the term "Swiss made," and state that "A watch is considered to be 'Swiss' if:  1. its movement is made in Switzerland; 2. its movement is cased up in Switzerland; and 3. the manufacturer carries out the final inspection in Switzerland."  This is essentially the same wording that appears in Article 1(a) of the Ordinance.  It is Article 3, paragraph 4 of the Ordinance that makes reference to the term "Swiss made":  "4. The 1st and 3rd paragraphs are also applicable when these appellations are used in translation (in particular "Swiss", "Swiss made", "Swiss movement") with the true indication of origin of the watch or with the addition of words such as 'style', 'type', 'form' or other word combinations."[28]

---

[28]  Paragraph 1 of Article 3 states that "The name 'Switzerland', indications such as 'Swiss", 'Swiss product', 'manufactured in Switzerland', 'Swiss quality' or other appellations which contain

Cancellation No. 92046786

The fact that the term SWISS MADE does not appear in respondent's "Standards" is not a sufficient basis for us to find fraud. Respondent's response to the Office action was quite clear; it advised the examining attorney that it was submitting "a copy of its standards as well as an abstract of the Swiss Ordinance on which these standards are based." The submissions are also clearly marked. The standards are titled "The Standards," and the Ordinance, which is a separate document, is titled "Ordinance governing the use of the appellation 'Switzerland' or 'Swiss' for watches." Respondent made no false statements to the examining attorney, and a false statement is one of the critical elements in proving fraud. Further, there must be an intent to deceive the USPTO. Bose, 91 USPQ2d at 1941. Although deliberately omitting relevant portions of a document, or making a statement that, while true, gives only part of the story and therefore is deliberately designed to mislead, may be treated as a false statement in its effect and also show the necessary element of intent, that is clearly not the case here. Petitioner's assertion that respondent submitted both documents in order to "outfox the examiner" is not a

the name 'Swiss' or 'Switzerland' or which may be confused therewith may be used solely for Swiss watches or watch movements," while paragraph 3 states "The indication 'Swiss movement' may be applied to watches which contain a Swiss movement. The word 'movement' must appear written out in full in the same type-face, dimension and colour as the appellation 'Swiss'."

substitute for showing that submitting both documents gave an incomplete picture and, in effect, resulted in the withholding of necessary information.  The examining attorney was given both the Standards and the Ordinance; both were clearly marked; and respondent clearly stated in its response that it was submitting both, and that the Standards were based on the Ordinance.

We find that petitioner has not proven its asserted ground of fraud.

Decision

We find that petitioner has failed to prove that it is entitled to judgment on any of the pleaded grounds.[29] Accordingly, the petition for cancellation is dismissed.

As noted in footnote 12, respondent must submit, within thirty (30) days, a redacted version of the testimony and exhibits of Vincent Stauffer, marking as confidential only material that is truly sensitive, failing which the testimony and exhibits previously submitted under seal will become part of the public record.

---

[29]  We have carefully considered all of petitioner's arguments and evidence, even if not specifically discussed herein, but have not found them persuasive.